947 F.Supp. 1338 (1996)
MARITZ, INC., Plaintiff,
v.
CYBERGOLD, INC., Defendant.
No. 4:96CV01340 ERW.
United States District Court, E.D. Missouri, Eastern Division.
August 29, 1996.
Patricia S. Williams, Wayne Mitchell Barsky, Sonnenschein and Nath, St. Louis, MO, for plaintiff.
Richard E. Haferkamp, Anthony G. Simon, Howell and Haferkamp, L.C., St. Louis, MO, Paul R. Williams, Bowling Green, MO, for defendant.

MEMORANDUM AND ORDER
WEBBER, District Judge.
This matter is before the Court on the motion of plaintiff for a preliminary injunction [document # 9], on the motions of defendant to compel [documents # 30 and 37], and on the motion of defendant for reconsideration.
Plaintiff Maritz, Inc., has brought this action alleging that defendant CyberGold, Inc., is violating Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), in connection with CyberGold's internet activities. Plaintiff seeks both permanent injunctive relief and monetary damages. Plaintiff seeks a preliminary injunction to enjoin CyberGold's alleged trademark infringement and unfair competition. On August 22, 1996, this Court held a hearing at which both parties presented evidence on plaintiff's motion for preliminary injunction.
In considering whether a motion for preliminary injunction should be granted, the Court must consider (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). The movant must show a threat of irreparable harm, and the absence of such showing is alone sufficient ground for denying a preliminary injunction. Id. at 114 n. 9. The Court has discretion to grant or deny a motion for preliminary injunction. Id. at 113-14.
Also, the burden on a party moving for preliminary injunction is a heavy one where granting the preliminary injunction will give the movant substantially the relief it would *1339 obtain after a trial on the merits. Sanborn Mfg. Co., Inc., v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 486 (8th Cir.1993). Here, plaintiff seeks both a permanent injunction enjoining defendant from "[u]sing the name `CyberGold' or any confusingly similar designation"; similarly, plaintiff's preliminary injunction motion seeks to enjoin defendant from "using the name `CyberGold' in connection with its planned Internet service."

I. Balance of Hardships
This factor requires a court to consider the balance between the harm to the party seeking an injunction and the injury that granting the injunction will inflict on other interested parties. Sanborn Mfg. Co., 997 F.2d at 489; Dataphase, 640 F.2d at 114. Plaintiff seeks to enjoin defendant from using the mark CYBERGOLD, asserting that it will suffer "irreparable harm" from the "ongoing confusion" between the internet services of the two parties. Plaintiff argues that the harm to defendant would be minimal because defendant's service is not yet operational and has not yet begun enrolling members. As of the date plaintiff filed its motion for preliminary injunction,[1] defendant had already expended considerable effort in the development of its internet service under the CYBERGOLD mark. CyberGold had developed extensive computer demonstrations and software for its anticipated online service. CyberGold had also made releases to the national press using the CYBERGOLD mark. CyberGold had also made numerous contacts and solicitations to potential advertisers who are potential customers of CyberGold. Thus, enjoining CyberGold's use of its name would undoubtedly cause considerable harm to CyberGold, forcing it to modify its computer designs and graphics and more importantly, requiring it to redo many of its advertising and promotional efforts in obtaining customers and an internet audience. Even assuming that, as of the date this action was filed, CyberGold had not yet enrolled any internet users as members to its service, the record shows that CyberGold had already expended considerable effort and money in soliciting companies and businesses to advertise on its service.
Any harm to plaintiff would arise as a result of the "ongoing confusion" caused by the alleged similarity between the two marks. Any harm caused simply as a result of confusion due to the fact that the functions and operation of plaintiff's internet service are similar to the functions and operation of defendant's internet service or as a result of the fact that both services are new to the public is not the type of harm relevant to analyzing this Dataphase factor. Rather, the Court properly considers only the harm that would be caused by conduct of defendant that would constitute a violation of the Lanham Act. Thus, whether plaintiff will suffer harm depends upon whether there is a "likelihood of confusion" that exists due to the similarity of the two marks. The Court must turn to the next Dataphase factor  the probability of plaintiff's success on the merits  to resolve this issue.

II. Probability of Success on the Merits
Section 43(a) provides owners of an unregistered trademark or trade name, such as plaintiff's unregistered GOLDMAIL mark, a right of action against infringement. 15 U.S.C. § 1125(a); Centaur Communications Ltd. v. A/S/M Communications, Inc., 830 F.2d 1217, 1220 (2d Cir.1987). As an essential element to a trademark infringement action, regardless of whether the trademark or trade name is registered or unregistered, a plaintiff must prove that a defendant's use of a particular name "creates a likelihood of confusion, deception, or mistake among an *1340 appreciable number of ordinary buyers as to the source of or association" between the two names. Duluth News-Tribune v. Mesabi Publishing Co., 84 F.3d 1093, 1096 (8th Cir. 1996); Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986). Similarly, the Second Circuit articulates the "likelihood of confusion" test as a "`likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.'" Centaur Communications, 830 F.2d at 1225 (quoted case omitted). Factors pertinent to a finding of likelihood of confusion include: (1) the strength of the trademark; (2) the similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse the public; (5) evidence of any actual confusion; (6) the degree of care reasonably expected of the plaintiff's potential customers. Anheuser-Busch, Inc. v. Balducci Publications, 28 F.3d 769, 774 (8th Cir.1994); see also Centaur Communications, 830 F.2d at 1225. These factors do not operate in a mathematically precise formula, but are to be used as a guide in determining whether a likelihood of confusion exists. Duluth News-Tribune, 84 F.3d at 1096.
In the first factor  the strength of the trademark  the Court must classify the plaintiff's mark as either 1) arbitrary or fanciful, 2) suggestive, 3) descriptive, or 4) generic in order to determine whether the mark is entitled to trademark protection. Id. Unlike marks that are merely descriptive or generic, suggestive, arbitrary and fanciful marks are deemed inherently distinctive and are thus entitled to protection because their intrinsic nature serves to identify a particular source of a product. Two Pesos, Inc., v. Taco Cabana, 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). The Court finds that the GOLDMAIL mark is at least suggestive. See Duluth News-Tribune, 84 F.3d at 1096 ("A suggestive mark is one that requires some measure of imagination to reach a conclusion regarding the nature of the products"). It requires some use of one's imagination that the Gold-Mail service is an internet service to provide financial incentives and rewards for reading electronic mail. Because the GOLDMAIL mark is suggestive, it is eligible for trademark protection without requiring any proof of secondary meaning. Two Pesos, Inc., 505 U.S. at 773, 112 S.Ct. at 2759.
The next factor requires consideration of the similarity between the defendant's and the plaintiff's marks. "The use of identical, even dominant, words in common does not automatically mean that two marks are similar." General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 627 (8th Cir.1987). Rather, in analyzing the similarities of sight, sound, and meaning between the two marks, a court must look to the overall impression created by the marks and not merely compare individual features. Id. The two marks, GOLDMAIL and CYBERGOLD, have internet addresses of "www.goldmail.com" and "www.cybergold.com." Initially, the Court finds that the two marks are not phonetically similar in sound other than the use of the word "gold." An obvious difference is that "gold" appears at the beginning of one mark and at the end of the other; the other words  "Cyber" and "Mail" are not similar in sound or meaning. Cf. SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1089 (8th Cir.1980) (finding similarity in sound between SQUIRT and QUIRST). Nor do the marks possess a similar appearance. At the hearing, both parties presented demonstrations of their services as they would appear on the internet. The computer graphics of each and the appearance of their marks were not similar. The closest similarity in visual appearance between the two occurs when the generic type internet addresses of "www.goldmail.com" and "www.cybergold.com" are compared, but that is largely a product of the function of the internet and its presentation of addresses. Both marks make use of the word "gold" in their name, an apparent reference to the fact that their internet services are to provide financial rewards for reading advertisements. Thus, there is some similarity in meaning.
It is relevant that gold is a common word, one that likely appears in many products and names, both on and off the internet. It is not unique in the sense that it is a seldom or *1341 infrequently used word in modern society. Consumers would be less likely to conclude that a product was from the same origin simply because a very common word was used on the product. On the whole, the Court finds that the two marks, while similar in their suggestive meaning, are not closely similar aurally or visually, and thus, overall, there is limited similarity between the two marks. Cf. General Mills, Inc., 824 F.2d at 627 (discussing overall comparison of "Apple Raisin Crisp" with "Oatmeal Raisin Crisp").
The third factor is the competitive proximity of the two parties' products. Considerable evidence presented at the hearing showed that the two services are or will be in direct competition with each other. Each seeks to capture an audience of consumers who use the internet. Both seek to target advertisements to these internet users. Both seek to reach the entire internet audience. Nothing in the record suggests that the parties will be targeting advertisements in areas exclusive to the other. Thus, there is a close competitive proximity between the two products, increasing the opportunity for confusion by consumers.
The fourth factor examines the alleged infringer's intent to confuse the two products. The evidence at the hearing suggests that neither party knew of the name or existence of the other party's internet service until approximately May or June of 1996. Robert Johnson testified that plaintiff first proposed using the GOLDMAIL mark for its internet service in the fall of 1995 and that it actually decided to use the mark in February or March of 1996. Plaintiff publicly announced its Goldmail service in May of 1996 and its online service began enrolling internet users on June 5 or 6 of 1996. Johnson testified that plaintiff began working on the concept for its internet service several years ago.
Nat Goldhaber is the CEO and founder of a corporation named Cyber-Bucks, Inc., which was incorporated on October 13, 1994. On December 5, 1995, Cyber-Bucks changed its name to CyberGold, Inc. Goldhaber testified that he formed this corporation to develop the concept and product for his internet service CyberGold. He testified that he first began to use the CYBERGOLD mark in March, 1995; that he first began business presentations using the CYBERGOLD mark in late March, 1995. Goldhaber testified that he made presentations to Intel Corporation in July and August of 1995. At these presentations he presented a computer demonstration of the planned CyberGold internet service and its features. On October 11, 1995, Cyber-Bucks, Inc. filed an intent-to-use trademark application regarding the CYBERGOLD mark. The evidence presented at the evidentiary hearing shows that CyberGold continued its efforts to develop its CyberGold internet service throughout 1996.
Based upon the chronological developments of the two competing internet services of CyberGold and GoldMail, there is no evidence that the CYBERGOLD mark was adopted or used in connection with the CyberGold internet service with any intent to cause confusion between the two products. Rather, it appears that the concept for both services and the adoption of the trademarks occurred without knowledge of the existence of the other.
The fifth factor looks at any evidence of actual confusion. "Proof of actual confusion is necessary for an award of damages. In order to obtain injunctive relief, proof of likelihood of confusion is required." Woodsmith Publishing Co. v. Meredith Corp., 904 F.2d 1244, 1247 (8th Cir.1990). Evidence of actual confusion may be the best evidence of likelihood of confusion, however it is not conclusive evidence and the court may find such evidence insufficient to establish the existence of a genuine issue of material fact regarding likelihood of confusion. Id. at 1250.
Plaintiff did not provide any admissible evidence of confusion among internet users who are or would likely be customers of plaintiff.[2] Plaintiff did provide evidence of *1342 an individual named Andres Blasquez-Ceballos, who was an acquaintance of a Maritz employee. Upon reading an article in the USA Today newspaper, Blasquez-Ceballos apparently inquired of the Maritz employee as to whether CyberGold was connected with GoldMail. The Court finds that this is not strong evidence of actual confusion. While Blasquez-Ceballos's inquiry may suggest that he was not completely clear as to whether GoldMail was associated with CyberGold, Blasquez-Ceballos's only knowledge of CyberGold was through a short newspaper article; he had not viewed a CyberGold advertisement or the CyberGold internet site. Further, the source of Blasquez-Ceballos's confusion is not clear and his inquiry suggests that he drew some distinction between the two names.
Plaintiff also presented evidence of confusion by Greg Koerner, an advertising sales representative who met with GoldMail employees. Koerner testified that he learned about CyberGold through an article in the USA Today. Koerner testified that he was confused because of both the similarity in the names CyberGold and GoldMail and the similarity of the products they offered. The Court finds that, similar to Blasquez-Ceballos, Koerner's only knowledge of CyberGold was through a short newspaper article and not through any advertisement of CyberGold. Nonetheless, Koerner's testimony is evidence of confusion between the two trademarks and is entitled to some weight in evaluating this factor.
Plaintiff also presented evidence that a writer for the New York Times was confused as to whether GoldMail was a different service than CyberGold. Again, the person who was confused only had knowledge of CyberGold through what he read in a newspaper article. Also, it is unclear that the source of the writer's confusion was the result of the similarity between the two trademarks.
On the whole, plaintiff has provided only one substantial incident of confusion  that of Greg Koerner, who testified that the similarity of the trademarks was, in part, the source of his confusion. The Court notes that each instance of alleged actual confusion presented by plaintiff arose solely from each individual's reading of an article in a newspaper article. Under the circumstances, this value of such actual confusion towards evaluating the "likelihood of confusion" is questionable because these individuals did not view any advertisement or product with the CyberGold name. Unlike the print newspaper articles which these individuals read, the CyberGold advertisements, releases, demonstrations, and its presently operating website which were presented to the Court, all convey a more complete picture of the CyberGold name and its visual appearance. In addition, these individuals are not the ordinary, typical customers of plaintiff who would be subscribers to the GoldMail service.
On the other hand, it is unlikely that considerable evidence of actual confusion would exist at this time, as both CyberGold and GoldMail have only recently been introduced to the public. Thus, while entitled to some weight, the Court cannot place too substantial weight on plaintiff's evidence of actual confusion.
The final factor to evaluate is the degree of care reasonably expected of the plaintiff's potential ordinary customers. Duluth News-Tribune, 84 F.3d at 1099. The Court looks at "`the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'" General Mills, Inc., 824 F.2d at 622 (quoting Scott v. Mego Int'l, Inc., 519 F.Supp. 1118, 1133 n. 17 (D.Minn.1981)). Internet users who subscribe to the CyberGold and GoldMail services are ordinary customers. Because these customers can or will subscribe to the two internet services free of any cost to them, it follows that the degree of care used by the ordinary customers will likely be minimal, increasing the potential for confusion.
After careful consideration of each of the above factors, the Court concludes that plaintiff has not shown that defendant's use of the CYBERGOLD mark creates a likelihood of confusion, deception, or mistake among an *1343 appreciable number of ordinary buyers as to the source or association of the internet services of the two parties. The Court places limited weight in plaintiff's evidence of actual confusion. The marks are limited in similarity and there is no evidence of intent to cause confusion on the part of defendant. Because plaintiff has not made a showing of likelihood of confusion, the Court concludes that plaintiff has not shown a probability of success on the merits as required by Dataphase.
To prevail in its trademark infringement claim, plaintiff must also prove that it actually adopted and used "a word, phrase, logo, or other device" to identify its particular goods or services prior to defendant. See First Bank v. First Bank Sys., Inc., 84 F.3d 1040, 1044 (8th Cir.1996). The evidence presented at the preliminary injunction was conflicting as to whether either party's internet service was actually fully operational. Each party's services were developed during similar time frames. Each party has only recently attempted to actually launch operational services on the internet. Thus, it is unclear to the Court as to whether plaintiff will be able to prove this element of its infringement claim.[3]

III. Threat of Irreparable Harm
To obtain a preliminary injunction, a plaintiff must show a threat of irreparable harm. Id.; see also Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 31 (2d Cir. 1995) Dataphase, 640 F.2d at 114 n. 9. In a Lanham Act case under section 43(a), a court can presume that irreparable injury will occur absent an injunction if the court finds a "`probable success in proving likelihood of confusion.'" Sanborn Mfg. Co., 997 F.2d at 489 (quoting Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc., 815 F.2d 500, 505 (8th Cir.1987)). As discussed above, the issue of "likelihood of confusion" is an element of showing a trademark infringement under section 43(a). The Court necessarily resolved this issue in concluding that plaintiff has not shown a probability of success on the merits because plaintiff did not show a likelihood of confusion existed. Thus, plaintiff has not shown irreparable harm.

IV. The Public Interest
This factor considers whether granting a preliminary injunction will be in furtherance and protection of the public interest. In a Lanham Act case, the Court should consider *1344 the consumer's right not to be confused as to the origin or source of goods. Calvin Klein Cosmetics Corp., 815 F.2d at 505. The Court should also consider the consuming public's interest in the ability to obtain the lowest priced goods. To this extent, the public interest is in favor of furthering competition, as long as the competition is within the legal parameters of the Lanham Act. Id. Because the Court's above findings with respect to the likelihood of confusion among ordinary consumers and because competition would likely further the public interest in this new, developing area, the Court finds that the public interest would not be furthered by the grant of a preliminary injunction.
Based on the above analysis of the Dataphase factors, the Court concludes that plaintiff's motion for preliminary injunction should be denied. Plaintiff has not shown the probability that it will succeed on the merits at trial as required by Dataphase. Because plaintiff has not shown that a likelihood of confusion exists, plaintiff has not met the required showing of irreparable harm.
At the hearing on the motion for preliminary injunction, defendant made an oral motion for reconsideration of the Court's August 19, 1996 memorandum and order determining that subject matter jurisdiction exists. Defendant's motion is a factual challenge to this Court's subject matter jurisdiction. Defendant also moved for reconsideration of the Court's order determining that personal jurisdiction existed over defendant in Missouri. For the reasons presented in this Court's August 19 memorandum and order, the Court finds that both subject matter jurisdiction and personal jurisdiction exist in this action. Thus, defendant's motion for reconsideration will be denied.
Also, defendant had filed motions to compel discovery. At the preliminary injunction hearing, defendant moved to withdraw such motions, as plaintiff represented that the discovery sought had been produced. Thus, the motions to compel will be denied as moot.
Accordingly,
IT IS HEREBY ORDERED that the motion of plaintiff for a preliminary injunction [document # 9] is DENIED.
IT IS FURTHER ORDERED that the motions of defendant to compel [documents # 30 and 37] are DENIED as moot.
IT IS FURTHER ORDERED that the motion of defendant for reconsideration is DENIED.
NOTES
[1] The evidence presented at the preliminary injunction hearing suggested that some actions taken by defendant CyberGold subsequent to the date plaintiff filed the present action and filed its motion for preliminary injunction were taken in an effort to expedite CyberGold's launching of its internet service from developmental stages to actual implementation. The Court makes no finding that these actions by CyberGold were actually taken for purposes of affecting the outcome of this action. However, because the purpose of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full effective relief, see Rathmann Group v. Tanenbaum, 889 F.2d 787, 789-90 (8th Cir.1989), the Court will look at the "harm" defendant would likely have suffered as of the date that this action was filed.
[2] Plaintiff did present a copy of an e-mail message from an apparent internet user (Pl.Ex. 7), however that document, upon objection, was not admitted into evidence. Even if the document was admissible, it does not show confusion arising from the similarity of the two trademarks. Rather, the content of the e-mail shows that the internet user recognized that a distinction existed between the GoldMail and CyberGold services.
[3] Defendant argues that its application for an intent-to-use trademark should have a bearing on whether plaintiff's have a common-law trademark with priority over defendant's mark and whether a preliminary injunction should be issued. Defendant filed an application for an intent-to-use trademark with United States Patent and Trademark Office (the PTO) regarding the CYBERGOLD mark on October 11, 1995. If CyberGold's mark is eventually registered upon the principal register, CyberGold will be issued a certificate of registration. 15 U.S.C. § 1057(a). Such certificate will "be prima facie evidence of the validity of the registered mark ... and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." 15 U.S.C. § 1057(b). If a registration certificate is issued on the principal register, the person holding the registration certificate for the mark has a nationwide right of priority in using such mark, dating back to the date the person filed its application to register the mark. 15 U.S.C. § 1057(c). Such right of priority exists as to all persons except those who, prior to the date such person filed the application to register, have used the mark or have filed an application to register the mark which is pending or has been registered. Id.

If eventually registered, to prevail in its action against defendant, plaintiff, claiming a common-law trademark, will be required to prove that it had a common-law trademark antedating the registration of defendant's mark. First Bank, 84 F.3d 1040, 1044 (8th Cir.1996). Based upon the dating back provision of the Lanham Act, 15 U.S.C. § 1057(c), if registration of defendant's mark is completed, plaintiff will be required to prove that its trademark antedates October 11, 1995. Plaintiff would have to prove that it actually used the GoldMail mark in connection with its internet service prior to that date. See First Bank, 84 F.3d at 1044.
Defendant's argument that, based upon the statutory scheme for registration of intent-to-use trademarks, its pending application should be considered in whether to grant a preliminary injunction is not without some merit, although contrary case law exists. See Talk To Me Products, v. Larami Corp., 804 F.Supp. 555, 558-60 (S.D.N.Y.1992). While the Court's decision to deny a preliminary injunction does not rest upon consideration of defendant's application for an intent-to-use trademark, the Court notes that, if registration is completed, plaintiff's case regarding its prior use of its common-law trademark may be substantially more difficult to meet.