**GREEN PRODUCTS CO., Plaintiff,**

v.

**INDEPENDENCE CORN
BY–PRODUCTS CO.,
Defendant.**

**No. C–97–177–MJM.**

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Sept. 25, 1997.

---

9. Doc. # 13.

Mark T. Hamer, Charles A. Meardon, Meardon Sueppel Downer & Hayes, Iowa City, IA, Ralph H. Lane, Pattishall McAuliffe Newbury Hilliard & Geraldson, Chicago, IL, for Plaintiff.

Donald G. Thompson, Bradley & Riley, Cedar Rapids, IA, for Defendant.

### OPINION AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

MELLOY, Chief Judge.

The sole issue before the Court is whether to compel Independence Corn By–Products Co. (ICBP) to convey the domain name "greenproducts.com" to the plaintiff, Green Products Co. (Green Products), for its use during the pendency of this litigation.

Green Products claims that ICBP violated Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), as well as state laws, when ICBP registered the domain name "greenproducts.com" as one of its own domain names on the internet.[1] Green Products moved for a preliminary injunction: (1) to enjoin ICBP from using the domain name "greenproducts.com", (2) to enjoin ICBP from using the expressions "green products" and "green pet products" as the whole or part of a trademark, trade name, or domain name, and (3) to compel ICBP to convey the

---

1. As of August 6, 1997, an internet domain search of all web sites owned by ICBP revealed that ICBP had registered a total of nine domain names. Carter Decl. (Doc # 6).

ownership of the domain name "greenproducts.com" to Green Products.[2]

In response, ICBP agreed to the first and second parts of Green Products' request, but it resisted the third part. During the pendency of the litigation, ICBP has consented (1) not to use the domain name "greenproducts.com", and (2) not to use the expressions "green products" and "green pet products" as the whole or part of any trademark, trade name, or domain name, but ICBP will continue to use those names "in ways that do not constitute trademark infringement, such as comparative advertising."[3] (*See* Def.'s Mem., at 7, Doc # 15.) In order to analyze the merits of Green Products' motion to compel ICBP to transfer ownership of the domain name "greenproducts.com" during the pendency of the litigation, the Court will begin with a brief background of relevant language and information.

### Background

The Internet is an international network of interconnected computers. *Reno v. ACLU,* — U.S. —, —, 117 S.Ct. 2329, 2334, 138 L.Ed.2d 874 (1997). The best known method of communication over the Internet is the World Wide Web (the web), which allows users to search for and retrieve information stored in remote computers. *Id.* Documents known as "web pages" (or "web sites") contain whatever information the site designer has decided to put there. These sites generally contain "links"—known as "hyperlinks"—to other documents created by that site's designer, or to other related sites. *Id.,* at 2235.

To navigate the web, an internet user can type an alphanumeric "domain name" such as "microsoft.com" to view the web site that is linked to that domain name. Internet domain names are "similar to telephone number mnemonics, but they are of greater importance, since there is no satisfactory Internet equivalent to a telephone company white pages or directory assistance, and domain names can often be guessed." *MTV v. Curry,* 867 F.Supp. 202, 203 n. 2 (S.D.N.Y.1994). In addition to domain names, another way to navigate the web is to enter one or more keywords into a commercial "search engine" in an effort to locate specific sites.

Because the web is filled with a vast array of sites, from the user's standpoint the web is comparable to both a "vast library of information and to a sprawling mall offering goods and services." *Reno,* — U.S. at —, 117 S.Ct. at 2335. From the designer's viewpoint, the web is a "platform from which to address and hear from a world-wide audience[ ] . . . of readers, viewers, researchers, and buyers." *Id.*

---

**2.** In full, Green Products moves this Court for an order: "preliminarily enjoining use of the domain name **greenproducts.com** and from using the expressions GREEN PRODUCTS and GREEN PET PRODUCTS, or any of them, as the whole, or any part of a trademark, a trade name, or a domain name on or in connection with its products made of corncobs, including litter or bedding for caged birds or for small animals; and compelling them, or such of them as may own or control the domain name **greenproducts.com**, to convey the domain name **greenproducts.com** to Green Products Co." (Pl.'s Mot. for Prelim. Inj., at 1, Doc # 3.)

**3.** At a hearing on the preliminary injunction, held September 11, 1997, Green Products agreed that the only issue before the Court was whether to compel ICBP to relinquish ownership of the domain name "greenproducts.com" to Green Products during the pendency of the litigation. With this acceptance, Green Products seemingly agreed that ICBP should be able to use the name "Green Products" or "Green Pet Products" for "comparative advertising" purposes.

Later in the hearing, however, ICBP used the phrase "comparative advertising" in a way that did not comport with traditional notions of comparative advertising (discussed *infra*). Because ICBP relies on this expanded notion of comparative advertising in refusing to relinquish the domain name "greenproducts.com" to Green Products, this Court finds it necessary to clarify what it understands that both parties have agreed to accept as suitable preliminary relief:

ICBP will refrain from using the names "Green Products" or "Green Pet Products" as any part of ICBP's trademark, trade name, or domain name, but ICBP may compare its products to those of Green Products by referring to the name "Green Products" in advertisements or informational brochures. For example, ICBP may compare its products to those of Green Products, and thereby use the name Green Products, in a comparative advertisement designed on ICBP's own web page, accessed through ICBP's domain names "icbp.com" or "bestcob.com".

In the case before this Court, Green Products and ICBP are direct competitors in the corncob by-products industry. On May 30, 1997, ICBP registered two domain names, "icbp.com" and "bestcob.com",[4] with the goal of eventually designing a web site that users could find through either domain name. On June 9, 1997, ICBP registered seven other domain names—five of which are formed by using the trade names of ICBP's competitors: e.g., "greenproducts.com." On July 16, 1997, Green Products tried to register "greenproducts.com" and "freshnest.com" (a sister company's name), but was told that ICBP had already registered those two domain names.[5] Green Products then filed a complaint and a motion for a preliminary injunction against ICBP.

## Discussion

### A. Preliminary Injunction Standards

To decide whether to grant the motion for a preliminary injunction, the Court must consider: (1) the probability that Green Products will succeed on the merits; (2) the threat of irreparable harm to Green Products; (3) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; and (4) the public interest. *See Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981) (en banc); *see also Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.,* 815 F.2d 500, 503 (8th Cir.1987); *Sports Design and Dev., Inc., v. Schoneboom,* 871 F.Supp.

1158 (N.D.Iowa 1995). When weighing these factors, "no single factor is itself dispositive; in each case all factors must be considered to determine on balance whether they weigh towards granting the injunction." *Calvin Klein,* 815 F.2d at 503.

■■ The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief. *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 489 (8th Cir.1993); *Ferry–Morse Seed Co. v. Food Corn, Inc.,* 729 F.2d 589, 593 (8th Cir.1984). Even though "preserving the status quo" is the primary function of a preliminary injunction, there are certain circumstances in which the Court has discretion to issue a preliminary injunction that does more than simply preserve the status quo. For example, when the moving party proves that simply preserving the status quo would still cause irreparable harm, the Court can use its discretion to order the parties to take some kind of affirmative action. *See, e.g., Ferry–Morse,* 729 F.2d at 593 (ordering company to deliver seed corn).[6] Additionally, where granting the preliminary injunction would grant essentially the same relief that the moving party would obtain if it won at trial, the movant's burden to prove that the balance of factors weighs in its favor is a "heavy one." *See Sanborn,* 997 F.2d at 486, *citing Dakota Indus., Inc. v. Ever Best Ltd.,* 944 F.2d 438, 440 (8th Cir.1991). Ultimately, the Court has discretion to grant or deny the

---

4. According to Green Products, "Bestcob" is a claimed trademark of ICBP. (Pl.'s Mem., at 2, Doc # 4)

5. ICBP and Green Products have resolved through negotiation the ownership of the "freshnest.com" domain name, resulting in ICBP's relinquishing ownership of "freshnest.com" to Green Products. Schryver Decl. ¶ 8.

6. In *Ferry–Morse,* the Eighth Circuit also noted that "where the status quo is a condition not of rest, but of action, and the condition of rest . . . will cause irreparable harm, a mandatory preliminary injunction is proper." *Ferry–Morse,* 729 F.2d at 593. To understand what this means, it is helpful to know some of the specific facts of *Ferry–Morse.* Ferry–Morse was a seed corn company that had contracted to market Food Corn's seed corn. 729 F.2d at 593. Ferry–Morse had been marketing Food Corn's seed corn for awhile, when a disagreement developed over the

terms of its contract with Food Corn. *Id.,* at 590. While they were disagreeing about the terms of the contract, Food Corn refused to give Ferry–Morse several thousand bags of seed corn. *Id.,* at 590. The Court issued a preliminary injunction ordering Food Corn not to market the hybrid seed corn to any other party but Ferry–Morse, and to compel Food Corn to deliver the seed corn to Ferry–Morse. *Id.,* at 591. The Court found, *inter alia,* that the status quo was a condition of action (Ferry–Morse's marketing of the seed corn, as it had been before the disagreement developed), and that the condition of rest was Food Corn's refusal to deliver the seed corn. *Id.,* at 593. Because the Court found that the condition of rest would cause irreparable harm, it held that the mandatory injunction of compelling Food Corn to give Ferry–Morse the seed corn was proper. *Id.,* at 593.

motion, and its decision may not be disturbed absent a clearly erroneous factual determination, an error of law, or an abuse of discretion. *Calvin Klein,* 815 F.2d at 503. With this standard in mind, the Court will address each factor in turn.

### B. Analysis of Dataphase Factors

#### 1. Probability that Green Products will succeed on the merits

In deciding whether to grant a preliminary injunction, the Court's initial estimation of the strength of the plaintiff's case plays a role, but it is not determinative. The probability of success does not require that the party seeking relief prove a greater than fifty percent likelihood that it will succeed on the merits. *Dataphase Sys. Inc.,* 640 F.2d at 113. Instead of a rigid measuring stick, the Court flexibly weighs the particular circumstances of the case to determine "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Calvin Klein,* 815 F.2d at 503, *quoting Dataphase,* 640 F.2d at 113.

 An essential element to a trademark infringement action is that the plaintiff must prove that a defendant's use of a particular name " 'creates a likelihood of confusion, deception, or mistake among an appreciable number of ordinary buyers as to the source or association' between the two names." *Maritz, Inc. v. Cybergold, Inc.,* 947 F.Supp. 1338, 1339 (E.D.Mo.1996) (quoting *Duluth News–Tribune v. Mesabi Publ'g Co.,* 84 F.3d 1093, 1096 (8th Cir.1996)). Factors relevant to determine the likelihood of confusion or deception are:

(1) the strength of the trademark;

(2) the similarity between the plaintiff's and defendant's marks;

(3) the competitive proximity of the parties' products;

(4) the alleged infringer's intent to confuse the public;

(5) evidence of any actual confusion; and

(6) the degree of care reasonably expected of the plaintiff's potential customers.

*Maritz,* 947 F.Supp. at 1340, *citing Anheuser–Busch, Inc. v. Balducci Publications,* 28 F.3d 769, 774 (8th Cir.1994), *cert. denied,* 513 U.S. 1112, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995). The Court will next examine each of these factors in turn, although not all of the factors are applicable in this case.

 In order to determine whether the trademark is entitled to protection, the Court examines the first factor—strength of the trademark—and classifies the plaintiffs mark as either (1) arbitrary or fanciful, (2) suggestive, (3) descriptive, or (4) generic. *See Cellular Sales, Inc. v. Mackay,* 942 F.2d 483, 485 (8th Cir.1991); *see also Duluth News–Tribune,* 84 F.3d at 1096. An arbitrary or fanciful mark is the strongest type of mark and is afforded the highest level of protection. *Cellular,* 942 F.2d at 486. At the other end, a generic term is used by the general public to identify a category of goods, so it does not receive trademark protection. *Duluth News–Tribune,* 84 F.3d at 1096, *citing Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75, 79–81 (7th Cir.1977) (holding "Lite Beer" to be generic). "Suggestive and descriptive marks fall somewhere in between. A suggestive mark is one that requires some measure of imagination to reach a conclusion about the nature of the product." *Id.* (citation omitted). In contrast, a descriptive mark "immediately conveys the nature or function of the product and is entitled to protection only if it has become distinctive by acquiring a secondary meaning." *Id.* (citation omitted) ("Cozy Warm ENERGY–SAVERS" is descriptive). Here, the Court finds that Green Products' trademark[7]—the name "Green Products"—is at least suggestive. The name "Green Products" requires at least some imagination to connect it with corncob by-products.[8]

---

**7.** While the name "Green Products" is both a trade name and a trademark, the Court will use the term "trademark" to refer to both the trade name and trademark. (*See* Pl.'s Mem., at 4) (stating that the "domain name **greenproducts.com** . . . is derived from Green Products'

trademark, service mark, or trade name GREEN PRODUCTS and/or the salient part of its corporate name (hereinafter referred to collectively as the 'trademark GREEN PRODUCTS'))."

**8.** In addition, the Court also finds that the name Green Products has acquired second meaning

▮ The next factor requires the Court to consider the similarity between the plaintiffs and defendant's marks. ICBP concedes that its domain name "greenproducts.com" is "undisputedly similar to the mark Green Products Co." (Def.'s Mem., at 15, Doc # 15.) However, ICBP also argues that its use of the mark must be viewed in the context of the marketplace, and that the "domain name only has meaning as an Internet address linking to ICBP's future web site and the web site will take every precaution to ensure there is no consumer confusion." (Def.'s Mem., at 15.)

In essence, ICBP's argument is that the Court should only compare the similarity of domain names and web sites linked to those domain names—not the similarity of ICBP's domain name and Green Products' trademark—because ICBP is not "selling a product on store shelves using the mark 'greenproducts.com'." (Def.'s Mem., at 15.)

The Court finds ICBP's argument clever, but ultimately unpersuasive. ICBP's argument is analogous to saying that ICBP has the right to hang a sign in front of its store that reads, "Green Products." When customers enter the store expecting to be able to see (and possibly, to buy) products made by Green Products, ICBP then announces, "Actually, this store isn't owned by Green Products; it's owned by ICBP. We don't sell anything made by Green Products, but as long as you're here, we'll tell you how our products are better than Green Products." In essence, ICBP is capitalizing on the strong similarity between Green Products' trademark and ICBP's domain name to lure customers onto its web page.

▮ Turning to the third factor, the competitive proximity of the parties' products, ICBP concedes that ICBP and Green Products are both competitors in the corncob byproducts industry. (Def.'s Mem., at 16.) Despite being direct competitors, ICBP ar-

gues that this Court should not focus on their similar corn by-products, but on domain names and their respective web sites: "the relevant 'products' for the likelihood of confusion analysis are not corncob products because ICBP does not sell any corncob products with the mark 'greenproducts.com' on a label or package design." (Def.'s Mem., at 16.) Instead, ICBP suggests, the Court should analyze whether a web site located at "greenproducts.com" is proximate to a web site located at "green-products.com" or "greenproductsco.com." (Def.'s Mem., at 16.) ICBP believes that these domain names are not proximate, because anyone who knows Green Products' domain name can use that name to go directly to Green Products' web site and "will likely never even see ICBP's web site." (Def.'s Mem., 16.) ICBP does, however, concede that the web sites are "proximate in the sense that a person guessing at Green Product Co.'s domain name might access ICBP's web site if it first tries 'greenproducts.com' ...." (Def.'s Mem., at 16.)

ICBP's argument basically boils down to the idea that the Court should view the domain names as mere addresses which—along with the web sites attached to each name—are products in and of themselves. The Court disagrees. There is a close competitive proximity between the products that the two companies sell, and there is also a close competitive proximity between the domain name "greenproducts.com" and the trademark "Green Products". The domain name "greenproducts.com" identifies the internet site to those who reach it, "much like a person's name identifies a particular person, or, more relevant to trademark disputes, a company's name identifies a specific company." *Cardservice*, 950 F.Supp. 737, 42 U.S.P.Q.2d at 1853. Because customers who do not know what a company's domain name is will often guess that the domain name is

---

meriting trademark protection. *See Duluth News–Tribune*, 84 F.3d at 1096. The Court bases this finding on the following facts: Green Products first began using the trademark "Green Products" in 1947, in connection with its alfalfa products, then after it began selling corncob byproducts in 1985, the trademark "Green Products" became associated with that new enter-

prise. Schryver Decl. ¶¶ 4–5. Since 1947, Green Products has spent in excess of $225,000 to advertise and promote its trademark "Green Products" and has earned a cumulative retail value in excess of $30 million. Schryver Decl. ¶¶ 4–6. The trademark is prominently displayed on its product bags and trucks. (*See* Pl.'s Exhibits 1, 2 & 3, Hearing held Sept. 11, 1997.)

the same as the company's name, a "domain name mirroring a corporate name may be a valuable corporate asset, as it facilitates communication with a customer base." *MTV Networks,* 867 F.Supp. at 203–204 n. 2.

Alternatively, even if this Court were persuaded that it should only compare the alphanumeric domain names (and not the products that each company sells, nor the similarity between ICBP's domain name and Green Products' trademark), this Court would still find a close proximity between the domain name "greenproducts.com" and any of the alternative domain names that ICBP suggests, such as "green-products.com", "greenproductsco.com", or "greenproducts-co.com." Under either analysis, there is a close competitive proximity, and that close competitive proximity further increases the opportunity of consumer confusion. *See Maritz,* 947 F.Supp. at 1341.

▆▆ Fourth, this Court examines whether ICBP intended to cause consumer confusion by creating an ICBP web site accessed through the domain name "greenproducts.com." ICBP maintains that it had no intent to "pass off" its products as those of Green Products, and that its only intent was to distinguish ICBP's products from those of Green Products through comparative advertising. McMorris, Aff. ¶¶ 7–8. ICBP believes that there will be no consumer confusion because internet users will immediately know that the web site belongs to ICBP once the actual web page appears on the screen (after users have typed the domain name "greenproducts.com"). To support this argument, ICBP distinguishes its planned web site from that in *Planned Parenthood Fed. of Am., Inc. v. Bucci,* 42 U.S.P.Q.2d 1430 (S.D.N.Y.1997), where an anti-abortion activist who registered the domain name "plannedparenthood.com" to lure pro-abortion internet users onto his web site designed a web page that deceptively announced that it was "Planned Parenthood's" site—instead of clearly announcing that the Planned Parenthood Federation of America had nothing to do with it.

While it is true that the *Planned Parenthood* court discussed how the graphics and design of the web page misled users into believing that the Planned Parenthood Federation was operating an anti-abortion web page, *see* 42 U.S.P.Q.2d at 1432, ICBP overlooks the fact that the *Planned Parenthood* court also found that a disclaimer would not have cured the confusion caused by the domain name:

> Due to the nature of Internet use, defendant's appropriation of plaintiffs mark as a domain name and home page address cannot adequately be remedied by a disclaimer. Defendant's domain name and home page address are external labels that, on their face, cause confusion among Internet users and may cause Internet users who seek plaintiffs web site to expend time and energy accessing defendant's web site. Therefore, I determine that a disclaimer on defendant's home page would not be sufficient to dispel the confusion induced by his home page address and domain name.

*Planned Parenthood,* 42 U.S.P.Q.2d at 1441.

Because ICBP's web site has not been designed yet, this Court will make no finding as to whether ICBP's web page is likely to cause consumer confusion between the products of ICBP and those of Green Products. However, based on the briefs, affidavits, and evidence presented at the hearing, this Court finds that the use of plaintiff's trademark as defendant's own domain name is likely to cause consumer confusion as to who owns the site. Just as customers entering a store that advertises "Green Products" as its store name would be initially confused to find, upon entering the store, that ICBP actually owned it, so will customers typing the domain name "greenproducts.com" be initially confused to find that ICBP owns the web site.

The Court acknowledges that such an interpretation of "consumer confusion" is somewhat different than that typically used to find consumer confusion in trademark infringement cases. Typically, the courts examine whether a company intended to confuse consumers into thinking that its own products were made by a competitor company. *See, e.g., SquirtCo v. Seven–Up Co.,* 628 F.2d 1086, 1091 (8th Cir.1980) ("Intent on the part of the alleged infringer to pass off its

goods as the product of another raises an inference of likelihood of confusion, but intent is not an element of a claim for trademark infringement.").

Here, ICBP did not intend to sell its corn by-products by passing them off as having been made by Green Products. However, ICBP did intend to pass off its domain name as though it belonged to Green Products. As a result of the confusion in thinking that Green Products' web site could be found through the "greenproducts.com" domain name, ICBP could deceptively lure potential customers onto its own turf, where customers would be told how ICBP is better than Green Products. This Court finds that such a deceptive use of a competitor's trademark as a way to lure customers away from the competitor is a kind of consumer confusion.

Moreover, even if such an interpretation of "consumer confusion" is not the relevant mode of inquiry, this Court also finds that ICBP's ownership of the domain name "greenproducts.com"—even without an adjoining web site—could cause consumer confusion about the corporate status of Green Products. Currently, if internet users browsing the web type the domain name "greenproducts.com", they are told that "[n]o documents match the query." After reading this message, users might randomly input other domain names, guessing that Green Products is registered under some variation of its trademark. Other users might try to find out who owns the domain name "greenproducts.com" by using various functions on the web where people can type specific domain names and find out who owns them. (*See* Carter Decl., attached exhibit; discussed in further detail at the hearing held Sept. 11, 1997.) Users who do this will learn that ICBP owns the "greenproducts.com" web site, and they will also learn the address and phone number of ICBP. Potential customers who see this information may be confused into thinking that ICBP has taken over Green Products, or that Green Products has merged into ICBP. As a result, customers may decide to buy from ICBP, believing that Green Products no longer exists or that ICBP now owns it. The consumer confusion thereby caused by ICBP's ownership of the domain name "greenproducts.com" during the pendency of litigation would cause Green Products to lose customers.

The fifth factor is incidents of actual confusion. Green Products concedes that because the web site is not yet operational, there have been no incidents of actual confusion (Pl.'s Mem., at 6, Doc # 4), so the Court need not examine this factor further.

■ The last factor is the degree of care reasonably expected of Green Products' potential customers. To determine this, the Court looks at the "ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 627 (8th Cir.1987) (quotation omitted). In contrast to focusing on how ordinary purchasers buy products, Green Products and ICBP speculate about the care with which ordinary internet users will search for Green Products' web site—presumably as a means by which to decide whether to buy its products. Green Products argues that customers "who would like to use Green Products' Internet services but do not know its domain name are likely to assume that 'greenproducts.com' belongs to Green Products." (Pl.'s Mem., at 7.) In response, ICBP argues that even though an internet user "may have some reasonable expectation that typing in a famous mark of a huge corporation like 'nike.com' or 'ibm.com' will lead to those corporate web sites, the same cannot be said for 'greenproducts.com', which is not a famous mark and which is made up of common generic words that are used in many contexts." (Def.'s Mem., at 17.)

ICBP's argument fails in its analysis of the relevant market, as well as in its insistence that Green Products is not a famous mark. This Court has found that Green Products' trademark is not generic, and is at least suggestive. (*See* discussion, *supra.*) Furthermore, Green Products presented evidence at the hearing that within the corncob by-products industry, Green Products and ICBP are two of approximately five major players, and ICBP did not dispute this evi-

dence.[9] Thus within the relevant market (i.e., the corncob by-products industry), Green Products' trademark is well known.

Despite the fact that Green Products' trademark is well known, ICBP argues that a consumer is just as likely to type "greenproductsco.com", "green-products.com", or "greenproducts-co.com" as it is to type "greenproducts.com". (Hearing, Sept. 11, 1997.) ICBP uses this hypothesis to suggest that Green Products could easily register "greenproductsco.com" as its domain name. It is interesting that ICBP makes this argument in light of the fact that ICBP's full name is "Independence Corn By–Products, Company," and that ICBP chose "icbp.com"—not "icbpco.com"—as its own domain name. Furthermore, the fact that ICBP chose to register "greenproducts.com" and not "greenproductsco.com" as the domain name for its "comparative advertising" plan could be viewed as further evidence that ICBP believed that potential customers would more likely type "greenproducts.com" than "greenproductsco.com".

Based on all the evidence before it at this point in the proceedings—including the finding that Green Products is at least a suggestive mark and that within the corncob by-products industry, Green Products' name is well known—this Court finds that ordinary internet users do not undergo a highly sophisticated analysis when searching for domain names. Because of the low level of care used to search for domain names, an ordinary internet user trying to find Green Products' web site would likely guess that Green Products' domain name was the same as its trademark, and thus type "greenproducts.com".[10]

In summary, despite the fact that neither Green Products nor ICBP can present or refute evidence of actual consumer confusion because ICBP's web site is not yet operational, this Court also considers the strength of Green Products' trademark, the strong similarity between Green Products' trademark and ICBP's domain name "greenproducts.com", the close competitive proximity, the likelihood that ICBP intended to capitalize on consumer confusion as a strategy to lure potential customers onto ICBP's web site (even though the actual web site will announce that Green Products does not own the site), and the degree of care that Green Products' potential customers will reasonably exercise in browsing the web to find Green Products' site. Based on this overall balancing, this Court finds a substantial probability that Green Products will prevail on the merits.

### 2. Irreparable harm to Green Products

■ The Court next analyzes the degree of harm, if any, that Green Products would suffer if not granted a preliminary injunction. The Eighth Circuit has held that a district court can presume irreparable injury from a finding of probable success on the merits of a Section 43(a) Lanham Trademark Act case. *Sports Design,* 871 F.Supp. at 1165, *citing Sanborn Mfg.,* 997 F.2d at 489. While this Court could thus presume irreparable injury based on its finding of probable success on the merits, it will also examine the specific circumstances of this case in order to decide whether allowing ICBP to retain ownership of the domain name "greenproducts.com" during the pendency of litigation would cause irreparable harm to Green Products.

Although ICBP has consented to putting the domain name "greenproducts.com" on hold until the final merits are determined, Green Products is concerned that even

---

**9.** Moreover, ICBP maintains that one of the main purposes of its web page will be to distinguish itself from Green Products. (Def.'s Mem., at 16.) If Green Products were not a major competitor, ICBP would probably not expend so much energy trying to establish a web site to distinguish itself from Green Products.

**10.** This finding is further supported by ICBP's own evidence. According to ICBP, an AltaVista search for the words "green+products" retrieved 876 web sites, and the query "green+product" retrieved 418 web sites.

Kraus Aff. ¶¶ 3–4. Thus even if an ordinary internet user began to search for Green Products' web site by typing key words into a search engine (instead of starting the search by guessing at what Green Products' domain name is), the number of web sites the search engine would retrieve may encourage the internet user to try to guess the domain name by typing Green Products' trademark, instead of muddling through the eight-hundred some sites that the search engine retrieved.

though ICBP would not have an actual web site that could be viewed by typing the domain name "greenproducts.com", customers could use other functions on the web to discover that ICBP owns that domain name. (Hearing, Sept. 11, 1997.) As a result, potential or actual customers might mistakenly conclude that ICBP has purchased the Green Products corporation, or that Green Products has merged with ICBP. This confusion could result in Green Products losing both customers and revenue during the pendency of the litigation, and it would be impossible to calculate how much money or how many customers were lost.

For these reasons, in addition to the fact that the Court believes that Green Products is likely to succeed on the merits, the Court finds that it would cause Green Products irreparable harm if ICBP were allowed to retain ownership of the domain name "greenproducts.com" during the pendency of the litigation.

### 3. Balance between this harm and the injury that granting the injunction will inflict on other parties

▮▮▮ ICBP has not finalized what its web page will look like, has not advertised that it owns a web page that can be viewed by typing the domain name "greenproducts.com", and has not listed "greenproducts.com" as one of its domain names in the Thomas Register.[11] If ICBP is compelled to relinquish ownership of the domain name "greenproducts.com" to Green Products during the pendency of the litigation, ICBP would still be able to launch its own web site via its registered domain names "icbp.com" or "bestcob.com". Furthermore, the act of transferring ownership of "greenproducts.com" would not hinder ICBP's ability to launch a web site that compares its products to those of Green Products: ICBP could still design and implement a web site that compares the products of ICBP to those of Green Products, and internet users could

access this web site through ICBP's other registered domain names.

While these factors weigh in support of compelling ICBP to transfer ownership of the domain name, there are also certain factors that weigh against the transfer. For example, if ICBP were to prevail at trial, Green Products would have to transfer the "greenproducts.com" domain name back to ICBP. This could cause some initial confusion, and possibly hostility, from customers who might have become accustomed to accessing Green Products' web site through the "greenproducts.com" domain name. In addition, because Green Products would like to advertise its domain name "greenproducts.com" in the Thomas Register, and because final changes to the printed version of the Thomas Register must be made by November 1, 1997, neither Green Products nor ICBP will be able to change the 1998 edition of the printed Thomas Register if ICBP prevails at trial.[12] As a result, ICBP worries that it "would risk incurring the anger of these customers if that domain name was suddenly switched. . . ." (Def.'s Mem., at 13.)

After weighing the potential harm that ICBP would experience by not being able to use its competitor's trademark as its own domain name, against the harm Green Products would experience by not being able to use its own trademark as its domain name, this Court finds that the harm to Green Products is more extensive and severe than the harm to ICBP. Although ICBP would experience some harm by transferring ownership of the domain name during the pendency of litigation, the transfer is not irreversible; if ICBP ultimately prevails on the merits, the Court will transfer ownership of the domain name back to ICBP. Additionally, even though some customers who may have become accustomed to finding Green Products' web page through the "greenproducts.com" domain name may be initially upset when they find that the domain name "greenproducts.com" has become the domain

---

**11.** The Thomas Register of Manufacturing is one of the methods by which both Green Products and ICBP advertise their products. Green Products has received substantial orders for its corncob products as a direct result of advertising in the Thomas Register. Schryver Decl. ¶ 10.

**12.** At the hearing held September 11, 1997, ICBP also said that the Thomas Register is available on-line on the web, and that ICBP presumes that on-line Thomas Register information can be updated more frequently than information can be updated in the printed version.

name for ICBP's web page (if ICBP prevails at trial), any harm that ICBP may experience because of Green Products' temporary ownership of the domain name could be tempered by a carefully designed web page or by hyperlinks to Green Products' web page. Moreover, given ICBP's goal of distinguishing its products from those of Green Products, the opportunity for ICBP to establish a comparative advertising web site located through the "greenproducts.com" domain name could be even more advantageous to ICBP if Green Products has already attracted customers to the "greenproducts.com" domain name.

For all of the above reasons, and especially considering the fact that the transfer of ownership is not irreversible because the Court will order the domain name transferred back to ICBP if ICBP prevails in litigation, the Court finds that the harm to Green Products is more extensive and severe than the harm to ICBP.

### 4. Public interest

■ In a trademark infringement action, the Court must balance the interest of protecting the public from confusion and deception against the interest of facilitating a competitive market. *Woodroast Sys., Inc. v. Restaurants Unlimited, Inc.*, 793 F.Supp. 906, 919 (D.Minn.1992), *aff'd*, 994 F.2d 844 (8th Cir.1993). Green Products argues that the public interest is best served by: (1) preventing trademark infringement and unfair competition; (2) enjoining ICBP from being able to capitalize on the "confusion or ensnarement of potential purchasers browsing the web"; and (3) helping consumers to avoid being "seduced into unwanted advertising messages, which is, in essence, what ICBP's homepage would be." (Pl.'s Mem., at 9–10.) ICBP argues that the public interest is best served by keeping the domain name on hold during the pendency of litigation, and

that compelling ICBP to relinquish ownership of the domain name would "actually foster public confusion" if ICBP were ultimately awarded ownership of the domain name through trial and the domain name reverted to ICBP. (Def.'s Mem., at 21.)

Because this Court believes that Green Products is likely to prevail at trial, this Court is not convinced that the public confusion which could result in the unlikely event that the domain name reverts to ICBP is so great as to prevent Green Products from obtaining immediate ownership of the domain name. Furthermore, even though one way to achieve a competitive market is through comparative advertising, the public interest is not well served when potential customers are lured onto a competitor's web site under the guise of comparative advertising. If ICBP were to prevail at trial and be awarded ownership of the domain name "greenproducts.com", such a result would have far-reaching consequences for both internet browsers and for companies seeking to advertise on the web.[13]

■ Based on the above analysis of the *Dataphase* factors, the Court concludes that Green Products has shown a probability that it will succeed on the merits at trial, that Green Products would suffer irreparable harm if it were not allowed to use its trademark as its domain name during the pendency of the litigation, that the harm that Green Products would experience if it cannot own the domain name "greenproducts.com" is more severe than any harm ICBP would experience in being forced to relinquish it, and that the public interest is best served by compelling ICBP to relinquish ownership of the domain name "greenproducts.com" during the pendency of litigation. Within this analysis, the Court has also considered that the transfer of ownership of the domain

---

13. The seriousness with which some courts and large corporations have viewed such ramifications can be partially seen by the trend in recent arbitration, settlements, and court judgments to award domain names to the companies which own the trademark. For example, other corporations which faced a similar situation to that faced by Green Products ultimately prevailed in the right to own the domain name containing their trademark: The Princeton Review Compa-

ny relinquished the domain name "kaplan.com" to Kaplan Education Center; Sprint relinquished "mci.com" to MCI; an anti-abortion activist relinquished "plannedparenthood.com" to Planned Parenthood; a New York journalist relinquished "mcdonalds.com" to McDonalds, Corp.; an ex-disc jockey relinquished "mtv.com" to MTV; and The Lectric Law Library relinquished "inter-law.com" to Interlaw, Ltd.

name is not irreversible, so if ICBP does prevail at trial, the Court can order Green Products to transfer ownership back to ICBP.

Additionally, the Court finds that Green Products has met a "heavy" burden of proof in establishing that not only will Green Products probably win at trial, but that the harm that Green Products would suffer if it were not allowed to use its own trademark as its domain name during the pendency of the litigation is severe enough to warrant affirmative action to compel ICBP to transfer ownership of the domain name.

Accordingly, it is **ORDERED:**

Green Products' motion for a preliminary injunction shall be GRANTED, as follows:

During the pendency of litigation,

(1) ICBP shall not use the domain name "greenproducts.com";

(2) ICBP shall not use the expressions "green products" and "green pet products" as the whole or part of a trademark, trade name, or domain name; and

(3) ICBP shall transfer the ownership of the domain name "greenproducts.com" to Green Products.

To transfer the domain name "greenproducts.com" to Green Products, this Court will provide an additional certified copy of this Order to Green Products, so that Green Products may send the Order to Network Solutions, Inc., thereby informing Network Solutions of the Court's judgment and authorizing Network Solutions to transfer ownership of the domain name to Green Products.