202 F.Supp.2d 918 (2001)
CHARTER COMMUNICATIONS, INC., Plaintiff,
v.
SOUTHWESTERN BELL TELEPHONE COMPANY, Defendant.
No. 4:01CV1376CDP.
United States District Court, E.D. Missouri, Eastern Division.
October 16, 2001.
*919 *920 Alan E. Popkin, James F. Monafo, I, Dutro E. Campbell, II, Husch and Eppenberger, LLC, St. Louis, MO, Louis Ramos, Jay D. Majors, Fried and Frank, Washington, DC, Ira S. Sacks, Fried and Frank, Washington, DC, for plaintiff.
Bradley A. Winters, Michael T. Marrah, Associates, Mark L. Brown, Shannon M. Blankinship, Sonnenschein and Nath, St. Louis, MO, John F. Medler, Jr., Southwestern Bell Telephone, L.P., St. Louis, MO, for defendant.

MEMORANDUM, ORDER, AND PRELIMINARY INJUNCTION
PERRY, District Judge.
Charter Communications asks me to enjoin Southwestern Bell's "Cable Modem *921 Slowdown" ad campaign, claiming that the advertisements in question are false and misleading. The evidence presented to me shows that the ads mislead the public by falsely suggesting that cable modem high-speed internet connections slow down significantly during peak usage periods, while DSL connections do not. The central message of the ad campaign is simply not true. Charter is entitled to the preliminary injunction it seeks. Pending trial on the merits, I will enjoin Southwestern Bell from running any advertisements in the St. Louis area that suggest that cable modem services experience more peak usage slowdowns than DSL services.
Charter filed this suit on August 28, 2001. After consultation with the parties, I entered an initial case management order on September 20. I held a hearing on October 9 and 10, 2001, and in addition to the two days of testimony and argument, the parties submitted eleven depositions and four binders of exhibits. I have now reviewed the evidence, and make the following findings and conclusions.[1]

Findings of Fact
Both plaintiff Charter Communications, Inc. and defendant Southwestern Bell Telephone Company offer high-speed internet connections to consumers in the St. Louis Metropolitan area. Most home computer users in St. Louis still use relatively slow dial-up modems to connect to the internet. As consumers use the internet more, and become accustomed to the faster connections frequently available at work, demand for high-speed connections at home is increasing. The parties agree that competition for this new or upgraded business is very intense, and expected to become even stronger in the next few years.
Charter provides a cable modem service known as the "Charter Pipeline." Charter's internet service operates on the same cable network that Charter uses for its cable TV service. Charter Pipeline offers three tiers of high-speed internet service so that consumers are guaranteed different speeds for different prices. Charter Pipeline speeds range from 256 kilobytes of data transmitted per second (kbps) to 1024 kpbs.[2]
Southwestern Bell provides Digital Subscriber Lines (DSL) service, which uses telephone lines to deliver the high speed internet connection. The speed of DSL varies depending on the distance the user's connection is from the phone company's equipment, but DSL speeds can equal or exceed those offered by cable modems.
Charter is the only cable modem provider in St. Louis, and although there may be other DSL providers besides Southwestern Bell, Southwestern Bell is by far the largest provider of DSL services in the area. Thus, the parties here are the major competitors in the high-speed internet business in St. Louis.

1. Description of the Ad Campaign

The "Cable Modem Slowdown" ad campaign at issue in this case consists of two television ads, a radio ad, a newspaper ad, and comments on Southwestern Bell's web page. In the "Family Meeting" television *922 spot, a father tells his wife and children that "no one gets to use the cable modem between 3 and 10 p.m.," because "these are peak usage hours and it moves slower." The parents then tell their grade-school aged children that they will have to go to bed at 5 p.m. and then get up to use their cable modem internet connection between the hours of 1 and 3 a.m., to "avoid cable modem slowdown." A voiceover then states, "There is a better way to get online. Southwestern Bell DSL internet. We're on it." Southwestern Bell's DSL logo and telephone number then appear. The radio ad follows the same format and contains much of the same language.
The "2 a.m." TV ad shows the same mother waking up the daughter and telling her that it is 2 a.m. and time for her to use the computer because "cable modem has full speed." The daughter goes downstairs where her brother, also in his pajamas, is using the computer. The daughter marks a chart, she and her brother talk about it being her turn at 2 a.m., and he tells her he has made a fresh pot of coffee. As the grade-school aged girl pours herself a cup of coffee, the voiceover says, "There is a better way to get online. Southwestern Bell DSL internet. We're on it." Southwestern Bell's DSL logo and telephone number then appears.
The print advertisements state: "Cable modems are great after 10 p.m. Hmmm, something else is really good then too. Sleep." They go on to state, "High Speed Internet with Prodigy DSL Internet is consistently fast during the peak usage hours of 3 to 10 p.m. when cable access can slow down. And when downloading music or streaming video, who wants to wait for `the right time' when no one else is online?"
The Southwestern Bell website states that cable modem "bandwidth is shared among all users in a neighborhood and will therefore vary, perhaps dramatically, as more users in a neighborhood get online at the same time." It also states that cable modem speed may be slower than that of DSL, in part because "too many people in a neighborhood are trying to send or receive data at the same time  causing congestion in the local cable network." It also lists as a DSL advantage: "Speed stays consistent, as opposed to the shared systems used by cable companies whose speed may decline as more users sign up." As a disadvantage of cable modems, the website says: "Shared bandwidth users cause slowdowns due to local network congestion."
Charter contends that the basic premise of these ads is false and that cable modems are no more subject to peak-hour slowdowns than are DSL connections. To understand who is correct it is necessary to look at three possible areas of slowdowns: the internet itself, the local provider network (i.e. Charter's network versus Southwestern Bell's), and each network's connection to the individual home.[3]

2. Delays Attributable to the Internet Itself

The parties agree that peak internet usage time for home users is between three and ten p.m. They also agree that during these time periods access to web sites, especially popular ones, can slow down considerably, because of the volume of traffic  that is, because of the large number of users trying to access the same internet site at the same time. Even during other hours web site access time may vary considerably because of high traffic. *923 For example, when the terrorist attack occurred on September 11, most users experienced delays in attempting to access news media sites. When a new game or popular movie trailer is released, users may experience delays logging on to those sites at any time of day, simply because so many people are attempting to access the site at the same time. These website delays have nothing to do with the type of connection one has, except that a high-speed connection (either cable modem or DSL) will almost always be faster than a dial-up modem.
Many consumers who have dial-up modems have experienced frustration while waiting to access internet sites or while waiting for particular items to download. Graphic images take more bandwidth (and thus more time) than text. "Streaming media," including music and videos, takes far more bandwidth than single images and therefore takes longer to download under any system.
The parties agree that this type of delay, and this type of inconsistency, is a function of the internet itself: it has nothing to do with whether one has DSL or a cable modem, or even a dial-up connection. Although some services are available to consumers to measure the speed of their internet connections, most consumers cannot tell whether delays they experience are attributable to the internet or to that consumer's internet connection.

3. Delays Attributable to the Provider's Local Network

While Charter's cable modem network and Southwestern Bell's DSL network are technologically different in how they connect the user's home to themselves (i.e., how a connection runs from a home to Charter is different from how one runs from a home to Southwestern Bell), the networks themselves are quite similar architecturally.[4] That is, each local network is simply a series of servers and routers which take the traffic, in a combined form, from either Charter's or Southwestern Bell's equipment, to connect to the internet. All other Internet Service Providers and network providers also do this in some similar form. At some point every service provider must connect to the internet through what the parties here referred to as a "megapipe"  a major connector through which all the traffic  together  goes to and from the internet. If this megapipe does not have sufficient bandwidth to carry all the traffic generated over the networks, data packets will be lost, and the network's connections in the users' homes will not be reliable. If the megapipe is operating at close to full capacity, users will experience slowdowns in accessing the internet, and may suffer packet loss. Again, all but the most sophisticated user will not know if this inconsistency is attributable to the service provider's network, to the internet in general, or to the particular network connection from that user's home.
To avoid this sort of "megapipe" network delay, service providers must manage their networks by carefully monitoring the traffic being carried. The parties agreed that any network approaching 80% capacity on it's "megapipe" needs to obtain more bandwidth to avoid slowdowns.
All type of networks can also experience delays when there are physical interruptions in the connections: construction activities can cut cable lines as well as phone lines, and if that happens users will lose internet connections. Other types of service interruptions are also possible in all *924 types of internet connection networks. Good network management requires monitoring and rapid correction of this type of problem as well.
The evidence showed that in January and February of 2001, Charter failed to manage its network appropriately, and it's "megapipe"  its connection from its edge router to the internet  was operating at capacities exceeding 95%. Contrary to what Charter's witnesses stated was proper network management, apparently no one fixed this problem for several weeks. None of the witnesses who testified before me appeared to have even known of the problem before this lawsuit was filed, although it certainly seems like they should have, if they had been doing their jobs properly. In any event, Charter purchased additional bandwidth several times between January and March, and the system returned to operating below 80% capacity. It approached the 80% mark again in April and May, and in June additional bandwidth was again obtained, taking the system back into utilization percentage rates in the sixties and seventies. Although Charter's witnesses testified that this kind of bad network management should never occur, they admitted that it had occurred at Charter.
The delays that Charter customers must have suffered in January and February, however, had nothing to do with the fact that this is a cable modem system. They had everything to do with bad network management. Although Southwestern Bell hinges much of its arguments on the fact that users must have suffered delays during this period, even Southwestern Bell admits that these problems were not caused by the cable modem architecture. Delays attributable to bad network management of this sort can occur just as easily with cable modem, DSL, or even with dial-up modem systems.

4. Delays Attributable to the Type of Connection

Under Charter's cable modem system, a coaxial cable connection runs from the user's home to a tap. This is the same cable used for cable TV service; it simply has one or more channels dedicated to carrying computer data instead of TV. The taps from various homes in one neighborhood converge on a "node." The Charter cable system is designed so that each node would handle no more than 500 homes.[5] The node is shared by however many homes within the 500 have subscribed to any cable service, and runs to a piece of equipment called a CMTS. Charter has 13 CMTSs in the St. Louis metropolitan area, and the computer data from those CMTSs is conveyed to a core router and then to an edge router, and from there goes to the internet. Under Charter's system, everything "upstream" from the node is shared.
DSL uses regular coiled copper telephone wire to run a connection from the user's home to a piece of equipment called a DSLAM; DSLAMs traditionally have been located at the phone company central offices. DSL speed varies depending on how far the home is from the DSLAM, and in general it needs to be within about three miles to work at all. Because of this limitation, Southwestern Bell has been placing remote terminal (RT) devices out in the field, so that DSL service can be provided to more homes. Under Southwestern Bell's system, everything "upstream" from the DSLAM or RT is shared, but the home-to-DSLAM/RT connector is not shared.
*925 Charter presented evidence that although the nodes are configured to have a maximum of 500 homes on the nodes, none of the nodes actually have 500 homes even subscribing to Charter's cable TV services, and the maximum penetration of any node for cable modem internet service is approximately 5%.[6] Thus, Charter's witnesses consistently testified that these "shared" portions of the system cannot be causing connectivity slowdown. Charter's witnesses testified that their Network Operations Center actually monitors this, and it has never showed traffic anywhere near capacity. Charter produced reports showing the traffic over the CMTSs, and those reports showed that the most heavily used CMTS, which is in West St. Louis County, has achieved peak usage of only approximately 40% of its capacity. Southwestern Bell did not seriously try to contest this evidence.
Southwestern Bell bases its claim that cable modems suffer from peak-period slowdown on three things: (1) it is theoretically possible that it could happen, because the "pipe" carrying traffic from the node to the CMTS and beyond is shared by multiple homes; (2) there have been anecdotal reports in the popular and technical press that cable modems may slow down during peak usage periods if enough people on one node use the service at once; and (3) a study conducted for a one month period in San Mateo, California, comparing speeds achieved by a DSL connection and a cable modem concluded that peak usage caused slowdowns (the Keynote study). I will discuss each of these arguments in turn.
It is theoretically possible for a cable modem system to have so many subscribers on one node that the capacity of that node would be exceeded, especially if all the subscribers on that node decided to download movies, music, or other large files all at the same time. The evidence showed, however, that this simply has not happened in St. Louis, and apparently has not happened elsewhere. None of the Charter nodes has more than 5% of the available homes subscribing to the cable modem service, and the home cable modem customers that Charter recently purchased from AT & T likewise have only minimal usage. Thus, although Southwestern Bell's first reason is theoretically possible, it has not happened in fact, and it cannot happen under the current system operated by Charter here.
Despite this testimony by Charter's witnesses, Charter's own website contains the following language, in a "Frequently Asked Questions" section comparing DSL and cable modem: "Cable modems use a RF signal to carry data through your cable wire. Because modem users share a single network connection to the internet, speeds will fluctuate depending on the number of customers online at the same time." When confronted with this language, Charter's witnesses testified they had never seen it and believed it was wrong. No explanation was given at the hearing for why Charter's web site contained the language.
Southwestern Bell points to numerous articles in newspapers, magazines, and on web sites stating that because cable modems use a shared architecture, the system could slow down if too many people in one neighborhood decided to use the system at the same time. While at least one article purports to be based on tests, most of the articles do not claim any basis for the statements other than the theoretical possibility set out above. These articles often do note that customers have complained that it has happened. As I previously *926 discussed, however, most customers simply cannot tell why their internet speeds are slowing, and cannot tell whether peak slowdowns are caused by congestion on the internet itself, by the providers not having sufficient bandwidth to serve all its customers (as happened at Charter earlier in the year), or because too many people are on the cable node. The fact that people say something is true does not necessarily make it so. This argument simply proves nothing about the fact at issue here  it just shows that people are looking for answers and are willing to believe an explanation (though unproven) that makes theoretical sense.
The Keynote study, which Southwestern Bell primarily relies on and which it provided to its advertising agency and the agency's lawyers as justification for the truth of the ads' claims, was written by Tammy Tu, who works for Keynote Systems, a California internet performance consulting company. Keynote is in the business of monitoring the performance and accessibility of web sites. It maintains and publishes the "Keynote Consumer 40 Index," which measures performance of 40 leading consumer web sites. Keynote's programs measure the download times for these web sites. In the study relevant here, Tu used Keynote's measurement software to compare download times for these 40 sites using a DSL connection somewhere in San Mateo, a cable modem connection in the same area, and a third commercial, high capacity system in the same area, which was included for comparison purposes. Tu's study made numerous measurements over a one-month period (in January of 2001) and observed that the cable modem performance began to degrade at 3 p.m., and got progressively worse until some time between 7 and 10 p.m., when it started getting better again. The DSL connection did not demonstrate the same pattern. The study stated: "We conclude that the shared local loop becomes congested as more cable modem users `log on' in the evening. DSL users are not subject to this type of contention and can expect the same level of local performance regardless of the time of day."
Tu testified in her deposition that the results of this study were valid for the area she studied in the month she studied it, but that the study should not be used as a basis for broader claims. There was no evidence presented to me concerning the architecture of either the cable modem network or the DSL network in San Mateo. Neither Charter nor Southwestern Bell were studied. The number of cable modem customers per node is not known. The size of the cable provider's "megapipe" to the internet and its utilization rates are not known. Tu testified that she had continued the measurements for several weeks after the period of the study and observed the results to reverse: the cable modem became consistently faster than the DSL. She testified that her company, when contacted by Southwestern Bell, had proposed performing a similar study directly comparing Southwestern Bell's DSL services to its various cable competitors in its 13-state area, but that Southwestern Bell had not hired Keynote to do this.
The evidence before me shows that Charter is correct in its contention that its cable modem network does not suffer any peak time slowdowns that are not also felt by DSL and all other forms of internet service. In other words, the evidence showed that peak slowdowns may be caused by many things, including: (1) poor management of an internet service provider's network in the form of simply not having sufficient bandwidth to service the entire network, (2) too much traffic on the internet or at particular web sites, (3) mechanical problems with a network or connection. *927 The evidence showed that all of these causes of download delay during peak hours are just as likely to occur with DSL as with cable. Charter's apparent admission to the contrary on its own website, although not adequately explained, does not change this conclusion. At most, I find that at some point in time someone at Charter thought it would be a good idea to falsely blame the system architecture for the problems caused by Charter's own bad network management.

5. The Ad Campaign and Its Effect

The ads are described above. The evidence showed that Southwestern Bell and its ad agency, Goodby, Silverstein, began discussing the Cable Modem Slowdown campaign in the spring of 2001. After focus groups reacted favorably to the ads, they were put into production and scheduled for release in July. The actual release date was not presented in evidence, but several documents indicated that it was expected to be July 16. Charter's witnesses testified they believed the ads began running in late July. The complaint alleges that Charter became aware of the ads in August.
In May, legal counsel for Goodby, Silverstein had raised questions about the factual basis for the claims, and Southwestern Bell told Goodby that the support was the Keynote study. The Goodby lawyers "advised [the ad agency] that claims made should be supported by fact and that they are problems related specifically to Cable. If in the end, we feel that the claims made are an exaggerated representation of things that can't be supported in fact, we should have the Client [Southwestern Bell] indemnify us before moving forward." No evidence of an actual indemnification was presented, so it appears that Goodby's counsel were ultimately satisfied by Southwestern Bell's responses.
On July 12, just a few days before the scheduled campaign launch, Southwestern Bell set up a telephone conference with Tammy Tu and others at Keynote, apparently because of continuing concerns over the factual basis for the ads. The Keynote staff informed Southwestern Bell that the Keynote Study was based on preliminary data over a one-month period in January, and that although it was valid for that time frame, data collected in later months "seems to be pointing to cable modem outperforming DSL." Keynote told Southwestern Bell that the study should not be used to support broader claims.
Several Charter representatives testified that after the ads began running they received inquiries from friends and customers, asking if it was true that cable modems slow down considerably during peak usage hours. Charter also presented evidence, through its own witnesses and through Southwestern Bell employees, that the high-speed internet connection business is extremely competitive right now, as both companies expect more and more home users to be seeking to upgrade to high speed connections in the next year or two. The evidence showed that most consumers do not understand the differences between DSL and cable modems, and may be looking for a way to distinguish between the two in making their purchasing decision.
The parties stipulated that the two ads cost $500,000 to produce. One witness testified by deposition that if Southwestern Bell had to pull the ads this week, it would lose approximately $100,000 in pre-purchased media time.
To support its defense of unclean hands, Southwestern Bell showed that the web site for Charter@Home, the service Charter recently purchased from AT & T, refers to Charter@Home as "the fastest internet connection," even though several *928 other services are faster. Under the "fastest" logo, the text message compares cable modem speed to dial-up modem speeds, but makes no mention of DSL or any other high speed possibility.

Conclusions of Law
Charter contends that Southwestern Bell is violating the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and is engaging in unfair competition under Missouri common law. Charter specifically argues that the following statements are false: (1) cable modem internet connections are unusable or impractical to use between the peak hours of 3:00 p.m. and 10:00 p.m.; (2) cable modem internet connection speeds slow down between these peak hours; and (3) DSL internet connections are more consistent than cable modem internet connections between these hours. Charter asks that I enter a preliminary injunction ordering Southwestern Bell to pull the ad campaign and any similar advertisements currently being planned, pending trial on the merits.

1. Legal Standards for Injunctive Relief

The standards for issuing a preliminary injunction are well established. I must consider the following factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) the public interest. Dataphase Systems Inc. v. C.L. Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981). No single factor is dispositive. Calvin Klein Cosmetics v. Parfums de Coeur, Ltd., 824 F.2d 665, 667 (8th Cir.1987). Charter has the burden of showing it is entitled to the relief sought.
By enacting the Lanham Act, "Congress apparently intended to encourage competitors to seek injunctions as a method of combating false advertising, and, in such cases that ultimately prove to have merit, injunctive relief is not to be issued reluctantly." United Industries Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir.1998). Nonetheless, the burden of demonstrating that a preliminary injunction is warranted under the Lanham Act is heavy when granting the preliminary injunction will "give [the movant] substantially the relief it would obtain after a trial on the merits." Sanborn Mfg. Co., Inc. v. Campbell Hausfeld, 997 F.2d 484, 486 (8th Cir.1993).

2. Lanham Act and Unfair Competition

The Lanham Act protects consumers and "persons engaged in commerce against false advertising and unfair competition." Clorox, 140 F.3d at 1179. The Act prohibits commercial advertising or promotion that misrepresents the nature, characteristics, qualities, or geographic origin of the advertiser's or another person's goods, services, or commercial activities. 15 U.S.C. § 1125(a)(1)(B).
To establish a claim under the Lanham Act for false or deceptive advertising, a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has a tendency to deceive a substantial segment of the intended audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement. Clorox. 140 F.3d at 1180. "The false statement necessary to establish a Lanham Act violation generally falls into one of two categories: (1) commercial claims that are literally false as a factual *929 matter; and (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive customers." Id. A third category, generally known as "puffery," is not actionable under the Lanham Act. Puffery is considered "exaggerated advertising, blustering or boasting upon which no reasonable buyer would rely and is not actionable." Id. These include representations of product superiority that are vague or highly subjective. On the other hand, false and misleading descriptions of "specific or absolute characteristics of a product and specific, measurable claims of product superiority based on product testing are not puffery and are actionable." Id.
If a plaintiff shows that a defendant's claim is literally false, a court may grant relief without considering whether the targeted audience was actually mislead. The plaintiff does not need to prove actual confusion. Where a commercial claim is not literally false but is misleading in context, the plaintiff needs to prove that the advertising actually conveyed the implied message and deceived a significant number of the targeted audience. If there was no intent to deceive or willfully violate, then evidence of consumer impact is essential. Id. at 1182-83.
Once a plaintiff has made a showing of likelihood of success under the Lanham Act, the court presumes that the plaintiff will be irreparably harmed. Id. at 1184.

3. Discussion

Charter argues, and presented evidence in the form of opinions by various experts within Charter, that the message, or "take away," of the Cable Modem Slowdown Ad campaign is that Charter's cable modem service is so affected by peak usage slow downs that it becomes unusable between the hours of 3 and 10 p.m. Southwestern Bell argues that the ads simply convey the true message that cable modem connections, unlike DSL service, can slow down during peak usage times because of the shared nature of the cable architecture. Not surprisingly, I find that the actual message is something in between these two arguments.
An average consumer viewing these ads, especially one currently using a dial-up modem and considering upgrading to a high-speed connection, would take away the message from these ads that cable modems can slow down significantly during peak usage times, and that the slowdown is significant enough to make the service less desirable than DSL to that consumer.
This central message is untrue. The evidence presented to me showed that, at least in St. Louis on Charter's network, peak usage slowdowns are not caused by the "shared" nature of the cable modem architecture. Because the ad campaign is based on the premise that the shared nature of the cable modem system causes the slowdowns, it is false and misleading.
Southwestern Bell argues that the ads are mere puffery, because no reasonable consumer would believe that people really have to wake their children in the middle of the night to use the internet, but this argument fails for the simple reason that the underlying message of the ads  the cable modem slowdown  is false. The doctrine of puffery protects humorous and exaggerated claims from violating the law only when the point that is being exaggerated is true  not when it is false, as it is here.
The ads are very funny, and they are very memorable. I have no doubt that they are very effective ads. This is particularly true because they appeal to two specific issues that dial-up modem customers seeking to upgrade (the target audience) *930 may be concerned about: First, dial-up customers have probably experienced peak time slowdowns with their current systems and find this frustrating. Second, consumers may have heard somewhere that cable modems suffer from peak-time slowdowns. The false message of the ads seems to confirm this misconception, and so the ads would be very effective in convincing a consumer to choose DSL over cable.
Charter has shown that it is likely to succeed on the merits of its Lanham Act and common-law unfair competition claims. The message of the ads is false and that falsity is likely to deceive the consumers because it is material to the target audience's purchasing decision, and the ads are likely to injure Charter.
Although irreparable harm can be presumed in a Lanham Act case, here I find that Charter has shown that it is suffering irreparable harm because of the ads. If consumers believe the false message, they will most likely be lost as potential Charter customers, and will choose DSL instead. Actually measuring which customers have been lost and calculating money damages to compensate for them would not be possible with any degree of accuracy.
The balance of harms also favors granting the injunction. Although Southwestern Bell has spent money on the ads and may forfeit some money spent on pre-purchased ad time, it knowingly took this risk when it went forward with the ad campaign even in light of the factual and legal questions raised by its own ad agency's lawyers.
Finally, the public policy favors truth in advertising, so this factor must, of necessity, follow the determination that Charter is likely to succeed on the merits. I also reject Southwestern Bell's argument that the public policy opposes the injunction because of the doctrine of unclean hands. Charter's use of the terms "the fastest internet connection" on the Charter@Home web page, while incorrect, is not misleading when read in context. The page on which the "fastest" title appears contains discussions only of cable modem and dial-up connections. There are no discussions of other forms of high-speed connections at all. This is not sufficient to defeat the other bases for granting the injunction.

Conclusion
Charter has shown that it is entitled to a preliminary injunction, and I will therefore enjoin Southwestern Bell from continuing the Cable Modem Slowdown Ad campaign or any other advertisement that suggests that cable modems are subject to peak usage time slowdowns. I will require Charter to post a $500,000 bond before the injunction becomes effective. I will refer this case to mediation, as I believe the time is ripe for meaningful settlement discussions between the parties. I will also set the case for a Rule 16 scheduling conference, so that the parties may expeditiously prepare for trial on the merits.
Accordingly,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that plaintiff's motion for preliminary injunction [# 14] is granted.
IT IS FURTHER ORDERED, ADJUDGED and DECREED that until the final determination of this action on the merits, or until the Court shall otherwise order:
1. Defendant Southwestern Bell Telephone Company, its employees, agents, subsidiaries, divisions, parent corporations, affiliated corporations, attorneys and privies, and all those in active concert or participation with them who have notice of *931 this Order by personal service or otherwise, be and hereby are restrained and enjoined as follows:
A. From continuing publication in the St. Louis metropolitan area of the commercials and advertisements comprising the Cable Modem Slowdown Ad Campaign  that is, two television commercials involving a family scheduling cable modem Internet use after 10 p.m. because of cable modem slowdown between the hours of 3 p.m. and 10 p.m.; radio commercials involving the same events; print ads referring to cable modem slowdown prior to 10 p.m.; and shall withdraw from its web page references to the same concepts; and
B. From publishing or disseminating in the St. Louis metropolitan area any commercials, advertisements or statements that assert, directly or indirectly, that:
(a) cable modem internet connections are unusable or impractical to use between the hours of 3 p.m. and 10 p.m.;
(b) cable modem internet connection speeds slow down between the hours of 3 p.m. and 10 p.m.; and
(c) DSL internet connections are more consistent than cable modem internet connections during the hours of 3 p.m. and 10 p.m.
IT IS FURTHER ORDERED, ADJUDGED and DECREED that this Order shall become effective only upon charter's posting of a bond in the amount of $500,000 for the payment of such costs and damages as may be incurred or suffered by any party who is found to be wrongfully enjoined or restrained.
Separate orders referring this case to Alternative Dispute Resolution and setting the case for a Rule 16 scheduling conference are also entered this date.
NOTES
[1] Because these findings are made only in the context of the motion for preliminary injunction, they are not binding at the ultimate trial on the merits.
[2] In July of 2001 Charter purchased AT & T's cable TV service in the St. Louis area, along with the related cable modem customers who were previously served by "Excite@Home." The engineering standards of this service are slightly different from Charter's Pipeline service, and the speeds promised to former AT & T users are different. Although Charter plans to move the two operations to the same standards, at the time of the hearing Charter had not yet done so.
[3] I recognize that this approach, and my description of the technical issues, is somewhat simplistic, but my purpose in simplifying the issues is to make the facts understandable to persons who are not network engineers.
[4] While there may be technological differences even here, the evidence shows they are differences without any distinction on the issue of speed and reliability as raised by the cable modem slowdown ad campaign.
[5] The AT & T cable service Charter recently purchased has some nodes designed for more than 500 homes.
[6] Even though the AT & T nodes may be designed for more than 500 homes, they also have very low penetration rates for cable modem internet services.